Good morning and a couple of bow ties. Good morning Nate, please the court. I'm Timothy Harris of the Goodstein Law Group on behalf of the Building Industry Association of Washington et al. It's called BIAW for short. I represent a consortium of small business owners and association that's affiliated with the residential home building industry. My clients are contractors, suppliers and subcontractors who are charged with complying with a sea of regulations, including the code that is the subject of this lawsuit. We bring this lawsuit because the lawsuit has been inequitable and it's preempted by federal law. It's also not particularly great at realizing actual energy savings in a cost-effective manner, which is the goal of the federal and the state law. This case specifically concerns Chapter 9 of Washington's 2009 Energy Code and the narrow question of whether Chapter 9 is expressly preempted by the Federal Energy Policy and Conservation Act or not. Under Chapter 9, in order to, as a prerequisite to constructing a new home in Washington, a builder must choose from a pick list of energy-saving options to obtain that building permit. That pick list includes options that concern products like hot water heaters or furnaces that exceed EPGA standards. The pick list also contains items that are not subject to federal standards, like solar panels, high efficiency windows and simply building a small house under 1,500 square feet. You would also get a penalty if you built a house over 5,000 square feet. Each of these pick list items ostensibly corresponds to a certain amount of energy savings. Each option is worth from one-half to up to three points, depending on the accumulation. The builder must achieve one point to comply with Chapter 9. Now Congress enacted EPGA to create a stability for manufacturers and distributors so that 50 states wouldn't create a patchwork of regulations for each covered product, so each state wouldn't have different standards for high efficiency furnaces, for that matter. That's an interstate commerce issue. EPGA generally prohibits states from enacting energy efficiency standards for covered products unless they fall under an exception. They say, yes. The statute was enacted when? In the 70s? Yes. Just to clarify something. President Ford. The federal statute does contemplate and want parallel state regulation that doesn't conflict, right? That's correct, Your Honor. Now, there are limited exceptions, though they intend to occupy the field, but there are limited exceptions under which a state can implement codes that exceed the federal regulations. That was enacted afterwards, right? That's correct. So initially, in 74, they preempted the field. That's right. That's right. So they've created an exception to allow for states' flexibility. And the exception was created when? It was created later. I don't remember the year that it was created. 80? Perhaps. Before this case came out. It created a seven-part test, and I can certainly look that up for you. On rebuttal, I'll have that. I was just curious. I mean, I can't remember how much time we've had to develop law under this. There's not a ton on this area. They created a seven-part test, basically, and they said, okay, states, if you comply with all seven of these factors, then you can have your law that exceeds the federal standards. And what they did was – What motivated that? Well, what motivated it was the legislature. The state legislature said, okay, state building code, you have to meet certain requirements. You have to incrementally increase the energy efficiency of a house by 2031. I believe it's by 70 percent. And so every three years, they go through. And what motivated the desire to – when it was initially passed, preempted the field. Right. And then sometime later, it said, okay, there are exceptions under which you don't have. And I'm just curious, what motivated that amendment? Because states – to give flexibility to states. Somebody said we wanted to give the state – Federalism, let's let the states experiment with this. Yeah, don't you think that Congress decided that energy savings, like politics, ultimately requires action at the local level? Well, I think that's absolutely true, and I think that's absolutely a laudable goal. And I think that has to be measured against this idea that we can't have 50 states implement a patchwork of different regulations for the same product. So we really focus on the seven-part test phase. Precisely, which is why Congress came up with the seven-part test. And said, basically, you can have the seven-part test. So if you come up with options – and the first part of the seven-part test that I'm going to discuss today is that if you have a test that includes options that are subject to the EPCA and ones that aren't, they have to be on a one-to-one basis. They have to be one-to-one basis in terms of the credit given for each one and the amount of energy that each one saves. So Chapter 9 was written ostensibly to achieve an approximate 8% savings in energy use. However, as I point out, the average isn't really relevant if we're talking about a one-to-one savings. And, in fact, my point is that the energy savings vary wildly and that they don't meet this one-to-one test. The statute just says – I'm not sure I'm understanding how you're interpreting the one-to-one test. The one-to-one test means that the amount of energy savings per point has to be equal. So – To each other. So the amount of energy savings for installing a hot water heater or a high-efficiency furnace under Option 1A. And they've calculated out and say, okay, this is going to save us 8% in energy. That same one point that is given for that increase in energy savings has to be approximately equal to energy savings for one point that is given for installing solar panels, for example. So that's the one-to-one ratio. It's energy savings, two credits. Does that make sense? Okay. Now – But that's not what happened, unfortunately. The credits are not on an equal one-to-one basis. And that's the primary reason why this case should be thrown out, that the law should be declared preempted and that we can get back to the drawing board and come up with some real-world solutions that actually save energy and are cost-effective. And that's really the goal of this suit. First, everybody concedes that two of the options, Option 6 and Option 7, which is really a penalty, are thoroughly incapable of being quantified. Chapter 6 concerns building a house below 1,500 square feet. Option 7 concerns – sorry, Option 6 and Option 7 concerns a penalty, a one-point penalty for building a house over 5,000 square feet. So no matter how big a house you build over 5,000, 5,000 to infinity, you're still getting one point – negative one point. And no matter how small a house below 1,500 square feet, you're getting a one-point credit, regardless of insulation, windows, and this sort of thing. Well, those same houses, that same one credit is the same one credit you get for installing a furnace that exceeds the federal standards. They're not on a one-to-one basis. They're not even close to a one-to-one basis because they don't know, actually, that energy saving is going to come with that 1,500-square-foot house. Now, they say – the state says on the right that, well, we all know that smaller houses use less electricity or less energy, and that's true. But a 500-square-foot one is going to use less than a 1,499-square-foot one, and neither of them is necessarily going to be on par with Option 1A, which saves 8% for putting in a high-efficiency furnace. So it's a very clear example where the options are not on a one-to-one energy-efficiency-to-credit basis, and I have several other examples of how that's true. By the way, this is, I thought, an important part, an important distinction, that the other side acknowledges are not on a one-to-one basis, and yet this issue is completely ignored by the district court below, which I thought was perplexing. The second is that under Table 2, which is Excerpt of Record 53 – Do you argue it? I argue it, yes. Ask the judge to reconsider? Absolutely. So what did he say? I didn't ask him to reconsider. You argued it. He must have responded to it or addressed it. He said he seemed to understand what I was arguing and thought it was a critical point and seemed, I thought, a pretty clear showing that the options are not on a one-to-one basis. I thought that he wrote something saying they don't. Close enough. Close enough. Basically close enough. Close enough. Yeah. It was the ruling in a nutshell. Yeah. Not to quote Judge Bryan, but that was basically what he wrote. Different word, but I can't remember what it was. Equivalent? Equivalent, yeah. Roughly equivalent. Roughly equivalent. Now, and that's interesting because the law itself says one-to-one. It just says it has to be one-to-one. If you look at the legislative history, which was relied on heavily by the state, it said they have to be, to the greatest degree possible, as close as possible to one-to-one. And that's fine, too. I mean, I understand the exact energy equivalency would be. Possible, practicable. Right. Exactly. And that's fine. It's not what the law says, but looking at the committee reports, I agree that that's a fair standard. That can be unreasonable. However, the small house size is not as close as possible to a one-to-one ratio. It's clearly not. And it's a clear error, and it seems like for that reason alone, this case should have been dismissed or should have been found to have Chapter 9 preemption. Preemption. Exactly. Second, if you just look at the tables, and they show there's the corresponding energy savings per credit point, and they're all over the board. They're from 6% to 10% up to 11%, just right on the face of Table 2. It's an excerpt of Record 53. Now, if I go buy something for $10 and I get 40% off, it's going to cost me $6. There's been a lot of quibbling about the percentage difference. I maintain that there's a 40% difference between the low end and the high end. And, again, that's not as close as possible, and I think we can do better. Finally, the preemptive, there are some of the options that are simply highly questionable. And BIW produced simple testimony to show the purported energy savings for water heaters were wildly inflated. The state has not specifically responded to this assertion. The state has offered the testimony of Gary Nordine in rebuttal to ostensibly rebut the BIW's testimony. But the simple arithmetic that I put forth in the briefing about the accuracy of the energy savings presented by Ted Clifton has been ignored, unfortunately. The district court, sua sponte, without argument, dismissed my testimony from my expert. I provided a testimony from a seasoned builder, a very well-respected builder, who teaches other builders. He's won national awards. They threw out his testimony because they said it was not believable under the Daubert standard. In fact, all Mr. Clifton was showing, one of the things that Mr. Clifton was showing, was that a water heater uses approximately 17% of a house's total value. We extended that out under options 5A and 5B, which concern hot water heaters, and says that the energy savings that they purport is simply not credible because the total energy savings from a hot water heater is only 17%, and this has never been disputed. I would think that with Mr. Clifton's credentials that he would have plenty of an expert to be able to testify on something like that. He's out there building houses. He's designing houses. He designs zero net energy use houses. He's a well-respected green builder. He knows how much a house uses, different components of a house use in terms of energy. The district court below mischaracterized and misrepresented Mr. Clifton's testimony as applying opinions on energy modeling, on computer energy modeling. The other side relies heavily on their computer modeling to show how they got to these various energy savings. What my expert is a guy who's out hammering nails and installing these products, says, no, this doesn't work. There's a bunch of examples where it doesn't work. In his testimony, he talks about how in warmer parts of the climate, if you use this type of sheathing, it's going to make the walls sweat. Gas isn't available in this type, in this area. Solar panels aren't available in these areas. And there's a lot of examples like this where individual options won't work in different areas. It's very simple testimony. It's testimony of an expert, I would say, under Evidence Rule 704, based simply on his observation as an expert in the field. Then your position, Mr. Harris, has to be that Judge Bryan abused his discretion in his evidentiary ruling? Yes. I believe he abused his discretion. As I pointed out in my opening brief, the district court mischaracterized and misrepresented Mr. Clifton's testimony. He's not provided testimony in energy efficient modeling. And the district court's mischaracterization and misrepresentation of his testimony, it's an abuse of discretion because it is implausible and it's without support and inferences that may be drawn from the record. Mr. Clifton was a builder? Yeah, he's a builder. He's been a builder for 40 years. Is he a member of this association? He is a member of this association, yes. And he was testifying on the basis of his personal experience? His personal experience, exactly. And the expert on the other side was who? They had a number of experts on the other side, including folks that also built green-built homes and folks that were involved in the computer modeling process. Anyone who did a computer? Yeah. We didn't go in. We didn't run. It's not some sort of extra testimony that would require peer review. It's simple observation. I install these hot water heaters all the time. I know how much they save. I know how much a standard one is. I know what the difference is. And the numbers that they're coming out with don't cut muster. They don't make sense to them. They think that it's a lot of extra time and money for very little energy savings. These guys don't think the code goes far enough. They want to see a fair and equitable application. And the one-to-one rule is exactly what that requires. It's a fair and equitable application of the law. Finally, the concern is also that by the sua sponte tossing out of Mr. Clifton's testimony, it sort of interferes with adversary system. The other side responded. We went back and forth on this. It's a legitimate issue about where it stands. We're not really given the opportunity to address it. However, even if this court upholds the lower court's decision on Mr. Clifton's testimony, we still have the fact that two of the options are thoroughly, totally unquantifiable, and there's a 40% range. And there are other options that are in the briefing. For instance, under options 3A, B, and C don't follow along logically. Option 3 requires six times the energy savings as option 3A, but only gets four times the number of points. There's lots of examples in here that don't make sense. Cold altogether, even without Mr. Clifton's testimony, it's pretty clear that these options, the point-to-energy-saving credit ratio, is not on a one-to-one basis. Okay, I see I have four minutes left. I'd like to reserve a minute for a bottle, Your Honor. That's fine, and we'll give you an extra minute so you can let the industry try to answer the state and the United States. You have broad shoulders. Thank you, Your Honor. We can use the time. Next we have for the State Building Code Council, is this Ms. Ann Esco? It is. Yes. Deputy Attorney General, we appreciate your coming from Olympia. I'm just a lowly assistant attorney general, not a deputy, Your Honor. Okay. Well, you're certainly not lowly, and we're just as happy and appreciative to have someone come here from Olympia as from Washington, D.C., so we're glad to have all of you. Thank you, sir. Good morning. I'm Washington Assistant Attorney General Ann Esco, appearing on behalf of the state. With me at counsel table is my co-counsel, Assistant Attorney General Sandra Adix, and as you indicate, also Thomas Byring from the United States Department of Justice. Could you clarify something for me? Yes, sir. I don't know if we issued an order or focused on this, but are you and is the United States going to argue? Yes, sir. And have you reached agreement on the time or did we provide that they would get a specified time already? Subject to the direction of the court, Mr. Byring would like five minutes of our allotted time. All right. So you're going to only use up 15? Yes. Okay. Go for it. Yes, sir. I also wanted to comment that in attendance today are attorneys Kristen Boyles and Amanda Gooden from Earth Justice, and they represent three of the intervening conservation groups. And so today when I refer to the state, I'm referring both to the state of Washington and to the intervening conservation groups. Chapter 9 complies with EPCA because it offers builders a broad and flexible range of pragmatic choices that do not require builders to exceed EPCA standards. The choices were based on sophisticated computer modeling that is the industry standard in this region, and that computer modeling demonstrated that the choices are as even-handed and fairly weighted as it is possible to be. This court should affirm the district court's decision because the BIAW has not demonstrated that any other real-world options exist or that it's possible for the energy efficiencies of options to be any closer than these. Is that your understanding of what the district court essentially said, that these are as good as they can be in the real world? Yes, based on the materially undisputed testimony of the state's computer modeling experts who said these results are reasonable and acceptable, and it's not practical to expect them to be any closer together. The BIAW has not met its burden of demonstrating clear and manifest intent to preempt a state police power law, and it hasn't met its heavy burden under Salerno in this facial constitutional challenge. And although Mr. Harris talked a bit about the evidence during his remarks, when you actually look at the evidence, he has not actually offered any evidence that actually raises any genuine issue of material fact. He talks about his experts' qualifications. In his brief, he concedes that this case is about energy modeling, and then he proceeds to concede that his expert knows nothing about energy modeling. The court asked a bit about legislative history, and just by way of background, EPCA was first enacted in 1975. It was amended in 1987 after the Department of Energy had given what a federal court thought were too many waivers and was starting to create a patchwork of state requirements. At the same time that the court gave relief to appliance manufacturers from those patchwork of requirements, Congress put in effect the preemption clause that is central to this case and the exemption from preemption clause that is central in this case, and clearly said that it was doing that to honor states' police power roles as states having had such an important role in managing the nation's energy resources. And the court also said that in light of the states' role, the seven factors in the exemption from preemption test were limited restrictions on state powers. What does that mean? Well, Mr. Harris argues as if the exemption from preemption clauses are to be construed broadly in favor of preemption, when in fact when you look at both the underpinnings of Salerno and you look at the law around preemption and you look at the legislative history, in fact the exemption from preemption language is to be construed narrowly against preemption. Any ambiguities are to be construed against preemption. Turning to EPCA Factor B, I'll be brief about this because Mr. Harris devoted most of his time to EPCA Factor C, but EPCA Factor B is one of the two underpinnings of the case and one of the two reasons why the district court was correct. The state has affirmatively demonstrated that builders are not forced to install high-efficiency equipment that exceeds EPCA standards. Our evidence has shown that the other options are all readily available, feasible, and currently being used by builders, including by Mr. Clifton. It's the undisputed testimony that Mr. Clifton frequently uses the options in Chapter 9 that do not include EPCA-covered products that exceed federal standards. I also wanted to point out that during rulemaking for Chapter 9, the BIAW was acting as a technical advisor to the State Building Code Council, and it said that Chapter 9 could be implemented, and I quote, without a huge impact. Turning to EPCA Factor C, it's important to have a definitional discussion before launching into the implications of EPCA Factor C. Congress did not define the word equivalent in EPCA, but in the legislative history it says that an option is equivalent when it is even-handed and fairly weighted as possible. And again, this is what the materially unrebutted evidence shows, that these options are as even-handed and fairly weighted as it is possible to be. So when Mr. Harris talks about a plus or minus 2% point spread among the options, or when he talks about what he describes as discrepancies in Table 2, he never explains why he thinks those numbers are too far apart. And, in fact, the record says, given the vast diversity of homes in Washington, the vast diversity in heating systems and construction methodologies, windows, insulation, heat pumps, water heaters, that that point spread, a plus or minus 2% point spread around the 8% goal, is as close as it is possible to be. Mr. Harris talked about water heating. The water heating example is a good example of the major flaw with the BIAW's case, which is that whether Mr. Clifton is purporting to speak as someone who knows something about energy modeling, which he does not, or he is talking as a builder, when you actually look at his allegation, and then you go look and see what kind of evidence he backs it up with, there's no there there. With respect to water heating, the BIAW makes great, attempts to make great mileage out of the allegation that there's only a 1.19% increase in efficiency. But when you look at Mr. Clifton's math, he left out the rest of option 5A, and he left out option 5B. So even assuming you accept his underlying mathematical assumptions, that a water heater uses 17% of a home's total energy use, and even if you accept his unfounded assumptions about what kind of arithmetic you're supposed to do, if you follow down that same path and you do the math, the math results are much higher for the other examples. When I did the math, and I'm not an expert, the difference is 10.2% and 6.9%, not 1.19%, and those higher percentages match the points shown in Table 1 and Table 2. The same is true of Mr. Harris's mention of the allegedly inequitable relative credits for building envelopes. Remember in Mr. Eckman's unrebutted testimony, there's three major categories of things that go into the energy efficiency of the home. There's the building envelope, there's water heating, and then there's everything else. Mr. Harris is saying, well, if you increase the energy efficiency of the building envelope, there must be a one-to-one relationship with the increase in the overall energy efficiency of the home. Well, he provides no support for that assumption, and in fact, logically, you would assume that that would not be the case, because there are more factors that go into modeling the energy efficiency of a home than just that. But would you explain, again, what you understand to be the one-to-one equivalency that's required? Yes, yes, Your Honor. According to congressional history, Congress recognized that one-to-one equivalency, exact equivalency, was not possible, and they specifically said options are equivalent. Oh, wait, wait. I'm on a one-to-one. What's the one and what's the other one? No, what are we comparing? Well, certainly reading the text of EPCA, it is the energy efficiency of the option and the credit that is assigned to it. For the purposes of this case, we have also been treating it as equivalency among the options also. And Congress did not provide an actual definition of one-to-one equivalency, but what it did say in the legislative history was options are one-to-one equivalent when they are as even-handed and fairly weighted as possible. And aren't we also talking in terms of both usage and cost? Well, EPCA refers to both energy use and energy cost, but the unrebutted testimony of Mr. Eckman and in the legislative history is that energy cost does not mean the monetary cost of the device. Right. It means the homeowner who is paying. Yes, what shows up on your electric bill. Right, the bill, yeah, what you pay. Right. It shouldn't have used cost. Right, right. Washington's code is based on energy use, not energy cost. Okay. So, right, right. So this distinction about, this definition about even-handed and fairly weighted is important with regard to Mr. Harris's discussion of the small home option. It's undisputed that up to one in five homes in Washington would qualify for a credit under Chapter 9 with expenditure of nothing else, no additional cost, just by virtue of their size. But the state was faced with a dilemma because it's also undisputed that these small homes cannot be modeled in the same way that everything else could. Everything else could be modeled by creating these prototypes and then changing one thing about each of the prototypes. With a small home, you have to model each individual small home. So the state was in a dilemma. How do we recognize and reward the builders of small homes? How do we reward their energy efficiency? Well, we could eliminate them entirely from the requirement of Chapter 9. And EPCA certainly doesn't prohibit a state under its police power saying, you builders of small homes, you're already energy efficient, you don't have to concern yourself with Chapter 9. The state took a different approach. It awarded those home builders a credit in Option 9. So the BAW's argument comes down to nothing more than form over substance. Congress intended to give states flexibility so long as the result is even-handed and fairly weighted. And under this fact record about the problems with modeling the energy efficiency of small homes, the undisputed fact that they use less energy, it was a rational approach. It was even-handed and fairly weighted to put a one credit in Chapter 9 to recognize those small homes. I think I'm at the end of my prepared remarks. The only thing I want to note is that the examples that I've given about the inadequacies in the BAW's evidence is a core part of the state's position. The state made a showing that, even though it wasn't its burden, that Chapter 9 meets both Factor B and C. And the BAW's evidence in response was conclusory. It wasn't there or it was based on a misunderstanding of either EPCA or the text of Chapter 9. So I'll entertain any questions the Court might have. Okay. Any questions for Ms. Esco? I take it that there's very little litigation that has arisen under this, that case law or decisions that we can use for guidance. Right, right. I think it's fair to say that both parties have looked high and low. Have I? Mr. Harris may have an opinion about the Albuquerque case, which we think is irrelevant, particularly because the New Mexico Court did not ever apply Factor B or C to a performance-based code, and any use of it for the penalty purpose is not justified. But we went into that in detail in our brief. And I'm sure all of us have had EPCA, B, and C on our Westlaw. Right. And nothing, nothing. Thank you. Well, we appreciate the views of the Attorney General and of you, so thank you. Thank you. We'll let Mr. Byron give us some perspectives of the U.S. of A. May it please the Court, I'm Thomas Byron from the Department of Justice, and I represent the United States as amicus. We appreciate the opportunity to participate in this case. Judge Schroeder, this is the first case to reach an appellate court interpreting these provisions, although they are about 25 years old. Yeah. The legislative, the history of enactments and amendments to EPCA is detailed in Judge Thomas' opinion for this court in the ACRI case in 2005. So that's a place to look if the Court's interested in more background information about the way this developed over time. Looking at the scope of federal interests that are at stake here, we think it's important for the Court to recognize that the federal interests are not one-sided, as Plaintiff's Counsel suggests. To be sure, there's an important and strong federal interest in ensuring uniformity of the national standards that are promulgated by DOE under its regulatory authority for covered products energy efficiency. But there's also a longstanding federal interest in encouraging states to improve building efficiency. And in the 1987 amendments, Congress expressly put in this exception to preemption to encourage states to adopt performance-based building energy codes that would give builders real choices in order to encourage them to make more efficient new construction and to have options to do so. The options that are set forth in Chapter 9 in the opinion of the United States based on the record and the arguments in this case, do not run afoul of the limitations in that seven-factor test in 6297F3. I point the Court to the Supreme Court's emphasis in cases like Medtronic that congressional purpose is the ultimate touchstone of the inquiry into the scope of preemption. And here, the congressional purpose appears largely directed to ensuring that states do not undermine the uniformity of the national standards by imposing undue pressure on builders to use higher efficiency covered products. And viewed from that perspective, Washington states adoption of a building energy code that takes account of the comprehensive set of considerations that were included in the computer model here. Considerations like climate differences, size of buildings, types of building construction, different options for improving building efficiency. That sophisticated background that underlies the choices in Chapter 9 seems to reflect an accommodation and an effort to achieve what Congress had in mind in encouraging the adoption of these performance-based codes. And Congress knew, because it was dealing with building codes, that it would be impossible to achieve the kind of mathematical precision that would ensure that energy use from option to option would be truly identical at the level of precision that plaintiff's argument would require. And what Washington has done here, and again with reference to that sophisticated and complex computer model that is the basis for the expert testimony in this case, we think is the best effort and is a serious effort that deserves respect in accommodating the interest of Congress in ensuring that there is not the kind of undue pressure on builders that would undermine the federal standards and the uniformity they require. And finally, with respect to cost under Factor B and whether cost differentials impose the kind of requirement that Congress said was prohibited, we would point out that it would be an extraordinary coincidence if all of the options that were set forth in Chapter 9 had precisely identical costs associated with them in all of the circumstances faced by builders constructing different houses in different parts of the state of different sizes and using different technical methods. Congress could not have meant, therefore, that the costs among the options must be precisely identical any more than it could have meant with respect to one-for-one energy equivalency of energy use that the kind of mathematical precision that plaintiffs have urged was required. I see my time has expired, and I would urge the Court to adopt, in affirming the opinion below, a decision that reflects the kind of acknowledgement of congressional purpose, and we appreciate the opportunity to present arguments. Could I just ask one question since you're from the Justice Department? Have a number of states adopted these kind of alternative codes or not? Judge Schroeder, the development of more efficient building energy codes is still, frankly, in an early stage as far as we can tell. We pointed out in our briefs that the Department of Energy has a program in place to encourage states to do so. We're not aware of a wide variety of different approaches that states have taken so far. The Court has no further questions. Well, just further to Judge Schroeder's question, of the 50 states, about how many do you think have their own codes? Well, most states adopt the model code, and one of the things that the Department of Energy does is work with the developers of the model codes. Okay, so they adopt a model code, and then they have their own people working on enforcing it? That's right, Judge Gold. And what Washington has done here is a departure, but we think it is a departure that reflects the kind of congressional intent and purpose set forth in 1697. Well, thank you, Mr. Byron, and thanks for traveling so far to inform us of the government's point of view. Now, Mr. Harris. I just want to talk about a couple of things. First, the misrepresentations with respect to Mr. Clifton's testimony. I didn't want to get into math, but my hand has been forced. I'm going to talk a little bit about the presumptions that are made with respect to preemption. According to Mr. Clifton, uncontested testimony, water heaters use 17% of a house's total energy use. The difference between a standard and a high-efficiency hot water heater is about 4%. That correlates to a 7% difference between the two. 7% of 17% is only 1.19%. That's the savings we're talking about, and it's set forth in Excerpts of Record, page 35. And I encourage you to go look at that, because the state represents to you also that Mr. Clifton ignored the second part of 5A, which discusses water flow and water-restricting features. That's just not true. It's right here. The state also says that Mr. Clifton represents the fact that that option is worth half a point. No, in fact, that's right there on page 18. So there really is a lot of interesting things here that really legitimately calls into question whether these options are on a one-to-one ratio. And I keep hearing, well, the Congress couldn't have meant this. Congress meant something else. What Congress said was one-to-one ratio. And I think I've presented to you that these are not presented on a one-to-one ratio, whether it's looking at water heaters, whether it's looking at the percentage difference between the individual options, or whether it's listening to the fact that two of the options are thoroughly unquantifiable. They sort of, the state talks about hypotheticals, how we could have laid it out differently, but instead they chose to put apples to apples when they're talking about small houses to components that exceed the federal standards. They're given the exact same type of credit. And that cannot be what Congress intended when it said they have to be set forth on a one-to-one ratio. Next. Well, you agree that it can't be precisely one-to-one. We'll never be able to do that if you're talking about different kinds of households. I don't think that it can. No, I don't think that would be practical. However, there are many cases. So how many of these things, 3 percent, 4 percent, how many of these things are really out of whack? Well, I think they're all out of whack, and I think they're also intertwined with one another because some are worth half a point and some have to be combined. Six and seven are clearly out of whack. I mean, the discussion really could end there. We could just say that the house size is clearly out of whack. And there's a whole point that I really haven't gotten to yet. My concern about the cost falls under Section B, is that the way the code is structured, all of the other options are either difficult, unwieldy, unavailable in all geographic areas, such that my discussions with builders and with Mr. Clifton, he says, ah, what we're going to do is we're just going to all stick in a furnace that exceeds the federal standards because it's the easiest and cheapest way to do it. And that gets to the fact that the code, as it's written, effectively requires the use of components that exceed the federal standards. And that's my point, too. It's in my briefing. If there are no questions on that, I'd like to get to the presumption matter. And the cases that have been cited over and over, the Altria and AHRI case, which they say present an obstacle to preemption because they present this idea that there's a presumption against preemption. But AHRI thoroughly supports my case. AHRI involved the submission of data to state government agencies under APCA. California had required appliance manufacturers to submit data to state agencies. And the state also required that they had to label their products with their brand names and this sort of thing. The court said that there was no preemption issue there. But the court specifically differentiated cases like the one we have here. The court at page 500 specifically stated that there is no indication that Congress in the preemption of APCA intended to preempt state regulations requiring the submission of data to government agencies. That was their case. The legislative history instead demonstrates that Congress intended to preempt state energy efficiency standards. That's our case. That is exactly the point here. There is no presumption against preemption. It is built into the fact that Congress said the subheading of 6297B, general rule of preemption for energy conservation standards. Okay. I see that my time is up. Well, you used it well. I thank you for your argument. I think we will say the argument is concluded. I again thank Mr. Harris, Ms. Esco, and Mr. Byron. And are there lawyers here for interveners today, silent lawyers? Well, thank you as well, silent lawyers. This is the best kind. Thank you for coming. So we thank all of you. And the case number 1135207 shall be submitted, and the Court shall adjourn until tomorrow. Thank you.
judges: Beistline, Schroeder, Gould